IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re LUCKY'S MARKET PARENT COMPANY, | : | Chapter 11 |
| *et al.*, | : | Case No. 20-10166-JTD |
| Debtors. | : | (Jointly Administered) |
| | : | |

| | | |
|---|---|---|
| ATM FORUM LOUISVILLE KY, LLC, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | |
| | : | Civ. No. 21-488-LPS |
| LUCKY'S MARKET PARENT COMPANY, | : | |
| | : | |
| Appellee. | : | |

---

## MEMORANDUM

## I.    INTRODUCTION

This appeal arises in the Chapter 11 cases of debtor Lucky's Market Parent Company and

certain of its affiliates ("Debtors"). On April 24, 2020, appellant ATM Forum Louisville KY,

LLC ("Landlord") filed an application seeking allowance of an administrative expense claim

based on its non-residential real property lease with the Debtors. Landlord asserted that the

Debtors: (i) violated Bankruptcy Court orders regarding removal of property from the leased

premises, (ii) wrongfully converted Landlord's property, (iii) negligently caused damage to

Landlord's property, and (iv) breached the terms of the lease prior to rejection. Following

evidentiary hearings on November 3, 2020 (AP783-1060) ("11/3/20 Tr.") and January 8, 2021

(AP1061-1329) ("1/8/21 Tr."), the Bankruptcy Court issued its opinion (D.I. 1-1)[1] and order

---

[1] The appendix (D.I. 15) to Landlord's opening brief (D.I. 14) is cited herein (consistent with its
pagination but not its index) as "AP__." The docket of the Debtors' Chapter 11 cases is cited
herein as "B.D.I. __."

(D.I. 1-2), *In re Lucky's Market Parent Co.*, 2021 WL 1100066 (Bankr. D. Del. Mar. 17, 2021) ("Decision"), denying Landlord's application. Landlord has appealed the Decision.

## II. BACKGROUND

### A. Parties and Lease

Debtors operated 39 full-service organic grocery stores in the United States. Debtors leased 37 of the stores and owned the other two. Landlord is a subsidiary of Arciterra Companies, a private real estate company that owns 70-100 shopping centers and other retail properties throughout the country. Relevant to this dispute, Landlord owns certain retail space located at 100-300 Hurstbourne Parkway in Louisville, Kentucky ("Store" or "Premises"). In 2013, Debtors negotiated with Landlord to lease the Premises. (AP578-AP590 ("Larmore Decl.") ¶ 12) On or about July 30, 2013, Landlord and Debtors executed a lease. (AP1390-AP1445) ("Lease")

The parties do not dispute the following findings by the Bankruptcy Court. The Premises had to be significantly modified in order to convert the existing retail space into one that could accommodate a grocery store. *See Lucky's Store,* 2021 WL 1100066, at *5. At the time the Lease was executed, the Premises did not have any refrigeration components or capabilities, including any in-slab refrigeration pipes, in-wall refrigeration pipes, or rooms for refrigeration. *See id.* In addition, there were no exhaust hoods, sinks/handwashing stations, or other items that are necessary to operate a grocery store. *See id.* The Lease required Landlord to construct or pay for "Landlord's Work" to alter and improve the Premises, including: (1) new electrical meter/distribution panel; (2) water meter/gas line sufficient to meet tenant's use requirements; (3) sewer lines to meet tenant's code requirement; (4) loading dock to accommodate a 75-foot semi-truck (with 53 foot trailer with truck cab) with doc leveler seals and proper loading

platform, the design to be agreed upon by the parties; (5) concrete slab repaired or replaced as needed to provide a clean and level slab ready for floor covering; (6) split-level section of Premises to be removed; and (7) a new façade and vestibule with new entry doors. *See id.* at \*6.

The Lease also provided that the Debtor would perform "Tenant's Work," defined as "all leasehold improvements, fixtures, equipment, and merchandise required for Tenant to open the Premises for business to the public that is not included in the Landlord's Work." *Id.* The Lease included a "Tenant Improvement Allowance" of $1,203,800, or $40 per square foot, that Landlord was to pay to Debtor in two payments – at the 50% completion mark and the 100% completion mark – conditioned upon receipt of reasonable evidence of completion, such as paid invoices and applicable lien waivers of subcontracted work. *Id.* at \*7.

Under the Lease, Debtors were obligated to maintain, repair, and replace all interior components of the Premises. Debtors were obliged to promptly repair any damage caused by removal of their personal property, with the exception of small holes caused by nails or fasteners.

### B.     Store Closing Procedures Order and FF&E Bid

On January 27, 2020 ("Petition Date"), certain Debtors filed voluntary petitions commencing a case for relief under Chapter 11 of the Bankruptcy Code. On the Petition Date, Debtors filed their *Motion for Approval of (I) Procedures for Store Closing Sales and (II) Assumption of the Liquidation Consulting Agreement* (AP1-50), seeking approval of the store closing procedures ("Store Closing Procedures") and assumption of a liquidation consulting agreement with Great American Global Partners, LLC ("Great American" or "Liquidation Consultant"). On January 28, 2020, the Bankruptcy Court entered an interim order approving

3

the relief sought (AP51-85) ("Store Closing Procedures Order") and on March 3, 2020, it entered a final order (B.D.I. 321).

Paragraph 4 of the Store Closing Procedures Order authorized the Debtors and the Liquidation Consultant "to sell or transfer the movable furniture, fixtures, or other equipment, excluding any and all property of the landlord including all real property improvements located on the Premises (the 'FF&E' and, together with the applicable inventory, the 'Store Closing Assets') located at the Closing Stores, and any such transaction shall be free and clear of all liens, claims, interests, and other encumbrances." (AP66)

Debtors retained Great American to assist with the sale of FF&E for the Store. Peter Wyke oversaw Debtors' liquidation sales on behalf of Great American. (1/8/21 Tr. at 96:5-9; 97:5-7) Great American contracted Dennis Jenkins as the lead liquidation consultant to help oversee Debtors' FF&E liquidation sales. (1/8/21 Tr. at 96:5-9; 97:5-7) Great American contracted Clarissa Mclean as the liquidation consultant to oversee the sale and removal of the FF&E at the Store ("Louisville FF&E").

Chad Renier is CEO of Mechanical Removal & Relocation, LLC ("Buyer" or "Mr. Renier"). (AP525-43 ("Renier Decl.") ¶ 9) Mr. Renier has 18 years of experience in the disconnection, removal, purchase, and resale of FF&E from grocery stores. (1/8/21 Tr. at 162:13-15; Renier Decl. ¶¶ 4-14) Based on photographs and discussions with Ms. Mclean, Buyer determined that a fair bid for the Louisville FF&E was $20,000 and submitted a bulk bid for the Louisville FF&E. Buyer's bid was the sole bulk bid.

On February 4, 2020, Buyer agreed to purchase the Louisville FF&E from Debtors for the purchase price of $20,000, evidenced by Invoice #80015 ("Louisville FF&E Invoice").

4

(AP1498)  The Louisville FF&E Invoice provided a non-exclusive list of equipment being sold

to Buyer, including:

> All removable FF&E to include but not limited to All FF&E
> located inside the facility, kitchen, bakery, shopping carts, deli
> equipment, refrigeration equipment, bailer, compactor, POS
> System, network equipment, server equipment, desktop computers,
> gondola shelving, butcher equipment, café equipment, walk in
> coolers, refrigeration racks and compressors (Freon to be removed
> by Lucky's before dismantling).

The Louisville FF&E Invoice also provided a non-exclusive list of FF&E that was excluded from

the sale to the Buyer, including:

> All leasehold improvements including but not limited to: A/C
> units, plumbing, lighting, flooring, fire suppressions/sprinkler
> systems, fire alarms, burglar alarms, doors, walls, ceilings, roofs,
> windows, electrical transformers, electrical boxes, bathroom
> fixtures, built in kitchen cabinets, built in work stations, lighting
> controllers, back up electrical generators, transfer switches and
> associated controllers, forklift/order pickers (if identified as
> leased), handheld computers, tablet computers, laptop computers.

(*Id.*)

###    C.    **Disputed FF&E**

As of February 12, 2020, most of the FF&E had been staged by Mr. Renier's team for

removal, under Ms. Mclean's supervision – but none of it had been removed.  (Renier Decl. at

¶ 40)  On February 12, 2020, Jeremy Hamilton, Landlord's leasing representative, learned that

Buyer was onsite and removing or preparing to remove property.  (AP1527-1536 at 5-9; 11/3/20

Tr. at 61:18-62:14)  Mr. Hamilton contacted Ms. McLean by phone to ask what property was

being removed, but Ms. McLean would not give him any information.  (11/3/20 Tr. 63:13-64:7)

Also on February 12, 2020, Debtors' counsel left a voicemail for Landlord, stating that "no

fixtures were being removed" and Debtors would cause the removal to cease for the day until Landlord's representative could be present to identify disputed items. (AP1541-42)

The parties dispute the events that followed. Sometime between February 12 and 13, 2020, Mr. Hamilton spoke with Ms. McLean and Mr. Renier on the phone, but the timing and content of those conversations is contested. Based on email chains entered into evidence, it appears that Mr. Reiner learned on the afternoon of February 13 that Landlord would have a representative at the Store on Tuesday, February 18 to identify any fixtures that Landlord asserted could not be removed. (AP1516-17) Mr. Renier stated that, based on a conversation with Mr. Hamilton on February 12, Mr. Renier was under the impression that Landlord's representative would be at the Store on Thursday, February 13 to complete the identification of disputed property. (Reiner Decl. ¶ 46) Mr. Hamilton disputes this assertion, maintaining instead that he was not able to make direct contact with any parties until Thursday, February 13, and that in all communications he made it clear a Landlord representative could not arrive until Tuesday, February 18. (11/3/20 Tr. at 128:19-130:24; 132:20-133:9) There is no evidence in the record that Debtors informed Landlord that February 18 was not acceptable.[2] Rather, Debtors and their agents expedited the removal of the Disputed FF&E, emailing: "hopefully [the Buyer] can get everything out prior to the landlord showing up." (AP1499-1505; AP1175-79; 1/8/21 Tr. at 114:17-118:5, 153:25-155:18)

Unaware that removal of the Disputed FF&E was already underway, on the morning of February 18, 2020, Landlord's representative Hamilton flew from Indianapolis, Indiana to Louisville to identify items Landlord contended were fixtures and could not be removed. (11/3/20 Tr. at 71:7-72:6) Upon his arrival, Buyer continued to load items onto trucks, and

---

[2] Monday, February 17 was President's Day, a federal holiday.

6

neither Buyer nor McLean provided Hamilton with a list of items removed.  (*Id.* at 98:20-99:2,

110:1-11)  Landlord demanded that Buyer and his crew vacate the Store.  It is undisputed that no

representative of Debtors, Liquidation Agent, or Buyer ever contacted Appellant to regain access

to the Premises to make any repairs.  (11/3/20 Tr. at 110:12-111:8; 1/8/21 Tr. at 99:24-100:22,

155:19-156:13, 189:2-16; Mclean Deposition Tr. at 80:2-16)

### D.   Damages

The following Disputed FF&E are categories of property that Landlord claims as

"fixtures" and were sold by Debtors and removed by Buyer:

> a.   Many (but not all) of the refrigerated and freezer display cases
>      ("Refrigerated Cases");
>
> b.   The remote refrigeration system, which includes copper pipes for Freon,
>      evaporative coils, 4 rooftop condensing units, and compressor/motor racks
>      ("Remote Refrigeration System");
>
> c.   Most (but not all) of the hoods ("Hoods");[3]
>
> d.   Most (but not all) of the deli display cases ("Deli Cases");
>
> e.   The baler ("Baler"); and
>
> f.   The two- and three-compartment prep sinks ("Prep Sinks").

The Disputed FF&E required significant disassembly and heavy equipment to move, including

cranes and forklifts.  (Renier Decl. ¶¶ 31-41, 48, 54, 58; AP1676-1678 (before and after photos

of Premises); AP2136-2280 ("Mclean Deposition Tr.") at 77:17-22, 82:5-84:22*); see also* Renier

Decl. ¶ 78 (regarding industry standard))  Landlord submitted extensive evidence, including

photographs, and it appears undisputed that damage was incurred in the process of removing the

---

[3] Landlord presented testimony that the Hoods were "fixtures" and were improperly removed,
but the Hoods were not claimed as part of Landlord's damages in the Application or in any of
Landlord's quotes.  The Bankruptcy Court found there was no evidence as to damages relating to
the Hoods.

Disputed FF&E beyond just "small holes caused by nails or fasteners." Debtors submitted Mr. Renier's Declaration, which addressed each category of the Disputed FF&E purchased (Renier Decl.¶¶ 63-80), and explained in detail the method of disconnection and removal undertaken by his team as well as the industry standard for such removal (Renier Decl. ¶¶ 81-90). The Renier Declaration asserts that, in line with industry standard, Buyer's crew removed no plumbing or water lines. (Renier Decl. ¶¶ 91-92 ("In our industry, certain things are not ever removed, purchased, relocated, or resold. Plumbing, including toilets and sinks in bathrooms, mop sinks, plumbing pipes, and water lines are never removed, and my crew did not remove any of these items.") The Renier Declaration details steps that would have been taken to repair damage had Landlord not been forcibly ejected from the Store mid-removal on February 18, 2020.

Landlord asserts that Buyer cut plumbing connections from sinks and detached sinks from walls, unbolting the sinks and breaking the silicone sealant used for attachment and waterproofing, and also damaging drywall. (AP1599-1602, AP1611-1612, AP1623-1624 (photographs from Premises); *see also* Renier Decl. ¶¶ 88-89 (regarding industry standard)) Copper pipes connecting the remote refrigeration system could not be removed unless Freon was first pumped out of them, which took several days, and drywall was damaged during removal of copper pipes from interior walls and ceiling. (AP1603-1604, AP1613-1622, AP1625-1691 AP2019-2023 (photographs of Premises and dairy refrigeration); *see also* Renier Decl. at ¶¶ 37-39, 66, 84-85) Copper piping that was specific for the Premises, and equipment installed and ran through and under a concrete slab, was cut at grade level, leaving an exposed pipe, and was sold for scrap value. (AP1642-1643 (before and after photographs); *see also* Renier Decl. ¶¶ 67, 84-85 (regarding industry standard)) Buyer also cut wiring run directly from the electrical panels through in-wall and/or in-slab conduits to specific refrigeration equipment throughout the store,

8

flush at the floor or wall exit points.  (AP1605-1606; AP1621-1623 (photographs of Premises);

AP1630, 1633, 1641, 1646, 1649, 1655, 1661-1663, 1673-1674 (before and after photographs of

Premises); AP1949, AP1952-1967, AP1985-2010 (photographs of refrigeration systems and

walk-in systems); *see also* Renier Decl. at ¶¶ 68, 87, 97) (regarding industry standard))  Buyer

damaged drywall at numerous locations throughout the Premises, such as where (i) refrigeration

copper piping previously connected refrigeration equipment, (ii) electrical connections exited

drywall and equipment was previously attached to wall, and (iii) refrigeration cases were

removed from the shopping floor area.  (AP1603-1606; AP1613-1622; AP1625-1691; AP1943-

1967; AP1985-2010; AP2019-2023; *compare with* Renier Decl. at ¶ 85 (regarding industry

standard))

   Landlord asserts that Buyer also removed: (i) the commercial grease trap (part of the

plumbing system), (ii) a portion of exhaust hoods and related roof top equipment (and jaggedly

cut the ducts that connected the hoods through the ceiling and roof, leaving a partial, unusable

duct within the ceiling area), (iii) heating and cooling coils for deli display cases, (iv) the baler

from the loading dock; (v) the refrigeration equipment from walk-in coolers; and (vi) the roof top

condensers and associated motors and compressors.  (AP1657-AP1658; AP1686; AP1937-1943,

AP1985-2010) (walk-in cooler before and after removal); *see also* Renier Decl. ¶¶ 72-80,

(FF&E purchased))  Ceiling tiles and ventilation hoods were removed and ducts were cut.

(AP1676-1686; AP2027-2038)  The polished concrete floors were scratched by the removal of

the refrigeration fixtures and from dragging equipment across the floor.  (AP1627, 1632, 1636,

1640, 1642, 1646, 1686; AP1932-1936; AP1947-1951; AP1952-1961; AP1962-1967; AP1968-

1976; AP2013-2019; AP1546-1549)  According to Buyer, while "[t]here will always be some

minimal ordinary damage from removal," "there was no damage [to the Louisville Store] above

what is ordinary and expected from removal of FF&E. We did not damage the plumbing, the electrical, the floors, or the ceilings." (Renier Decl. ¶ 90)

Appellant obtained bids from Indiana Retail Construction Co. ("IRCC") and Bosse Construction ("Bosse") for the cost of the repairs for the damage, and from Chef Supply for the refrigeration equipment, deli cases, and sinks that were removed from the Premises. (AP1552-1566 (Invoice dated August 10, 2020); 11/3/20 Tr. at 111:9-112:12; Larmore Decl. ¶¶ 37, 40; AP1357-1389; AP1546-1549 (IRCC construction quote, dated August 11, 2020); AP573-577 ("Howard Decl.") ¶¶ 14-17)  IRCC's bid to repair the damage to the Premises caused by the removal of fixtures and other personal property was $386,695. (AP1546-1549; Howard Decl. ¶¶ 14-17)  Bosse's estimate was substantially similar to IRCC's, totaling $364,633.34 (after excluding the Chef Supply bid amount of $1,385,211 and the 6% fee applied by Bosse). (AP1389)  Debtors did not obtain any counterbids or present any evidence regarding the damage done to the Premises.

On April 24, 2020, Landlord filed its *Application for Allowance of Administrative Claims Under 11 U.S.C. §§ 105, 503(b) and 365(d)(3)* (AP172-335) ("Application"), and filed a supplement to it on September 22, 2020 (AP478-510).

**E.    Evidentiary Hearing & Decision**

On July 9, 2020, the Bankruptcy Court held an initial hearing and heard oral argument relating to the Application and Debtors' objection thereto, treating the objection as a dispositive motion request. (AP437-477 ("7/9/20 Tr.") at 4:15-22)  At the initial hearing, the Bankruptcy Court found there were issues of fact and set a date for a final evidentiary hearing.  On October 29, 2020, the parties filed trial declarations in lieu of direct testimony.  Landlord filed the Larmore Declaration and the Howard Declaration; Debtors filed the declaration of their CFO,

Andrew T. Pillari (AP544-572 ("Pillari Declaration"), the Wyke Declaration (AP511-524), and the Renier Declaration. On October 30, 2020, Appellant filed motions to strike portions of the Pillari Declaration (AP661-729) ("Pillari Motion to Strike"), the Renier Declaration (AP730-748) ("Renier Motion to Strike"), and the Wyke Declaration (AP749-782) ("Wyke Motion To Strike").

The evidentiary hearing on the Application was held on November 3, 2020 and January 8, 2021. On the first day of the evidentiary hearing, the Bankruptcy Court granted the Pillari Motion to Strike in all respects and the Wyke Motion to Strike except as to paragraphs 10-16. (11/3/20 Tr. at 22:7-24:22; 29:16-23) Because the Pillari Declaration was not admitted, Debtors presented no evidence as to the parties' intent regarding the Lease. (*Id.* at 22:7-24:21)

On March 17, 2021, the Bankruptcy Court issued its Decision denying Landlord's Application and finding, *inter alia*, that: (i) the Lease unambiguously provides that all of the Disputed FF&E was the personal property of Debtors, (ii) all of the Disputed FF&E were trade fixtures and property of Debtors, (iii) Landlord did not put forward sufficient or credible evidence of damages, and (iv) even if Landlord had put forward sufficient evidence as to the amount of contractual damages for any failure to repair, Landlord would not be permitted to pursue such damages because Landlord created the obstacle that prevented performance. On March 31, 2021, Landlord filed a timely notice of appeal.

## III.    JURISDICTION AND STANDARD OF REVIEW

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. Pursuant to § 158(a), district courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees" and discretionary jurisdiction over appeals "from other interlocutory orders and decrees." 28 U.S.C § 158(a)(1) and (3). This Court reviews the

11

Bankruptcy Court's "legal determinations *de novo,* its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re American Pad & Paper Co.,* 478 F.3d 546, 551 (3d Cir. 2007). The Court must "break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992).

The Bankruptcy Court's findings of fact may only be overturned if they are "clearly erroneous." *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir. 1981); Fed. R. Civ. P. 52 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court judge to judge the credibility of the witnesses."); Fed. R. Bankr. P. 7052 (Rule 52 shall apply in adversary proceedings). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) (internal quotation marks omitted).

Decisions regarding whether to admit evidence are reviewed for abuse of discretion. *See Waldorf v. Shuta*, 142 F.3d 601, 626-27 (3d Cir. 1998). The reviewing court must give "singular deference to a trial court's judgments about the credibility of witnesses." *Cooper v. Harris*, 137 S. Ct. 1455, 1474 (2017); *United States v. Igbonwa*, 120 F.3d 437, 441 (3d Cir. 1997) (holding that clearly erroneous standard of review is "more deferential with respect to determinations about the credibility of witnesses").

## IV.    DISCUSSION

A decision to grant or deny an administrative claim is within the discretion of the bankruptcy judge, and, on appeal, is subject to review under an abuse of discretion standard. *See*

*In re Energy Future Holdings Corp.*, 904 F.3d 298, 312 (3d Cir. 2018).  An abuse of discretion occurs when a "judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 257 (3d Cir. 1995).  The burden of proving that a claim is entitled to treatment as an administrative expense is on the claimant. *See In re Phila. Newspapers, LLC*, 690 F.3d 161, 173 (3d Cir. 2012).  Here, then, Landlord was required to show that it was entitled to an administrative claim, and it was required to do so by a preponderance of the evidence.  *See Matter of Columbia Gas System, Inc.*, 224 B.R. 540, 548 (Bankr. D. Del. 1998).

### A.   The Bankruptcy Court Properly Denied the Application Pursuant to § 503(b) of the Bankruptcy Code

Section 503(b)(1)(A) defines administrative expenses as "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).  Section 503 is strictly construed to keep administrative expenses at a minimum, so as to preserve the estate for the benefit of creditors.  *See In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001).  A claimant asserting entitlement to an administrative expense claim carries the "heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999).

Landlord asserted entitlement to an administrative expense claim based on the removal of FF&E.  The Bankruptcy Court determined that: (a) the Lease is unambiguous with respect to the property that would remain property of Debtors upon termination of the Lease, and (b) all of the Disputed FF&E are trade fixtures under Kentucky law and the Lease. *See Lucky's Market*, 2021

WL 1100066, at *10-11.  Landlord argues on appeal that the Bankruptcy Court erred, as "even a cursory review of the Lease reveals that it is ambiguous."  (D.I. 14 at 21-22)

> **1.     The Lease is Unambiguous with Respect to the Property that Would Remain Property of the Debtors Upon Termination of the Lease**

There is no dispute that the Lease is governed by Kentucky law.  (*See* Lease ¶ 32(i)) Kentucky law provides that "[t]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court."  *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000). "Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence.  A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations.  The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms."  *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (internal citations omitted).

Landlord agrees with the Bankruptcy Court that the Lease permitted Debtors to remove trade fixtures but not to remove other fixtures.  (*See* D.I. 14 at 7 & 14; AP 210 ¶ 11)  Landlord argues that the Lease is ambiguous because it fails to define "fixtures" and "trade fixtures." Under the Lease, Landlord agreed to pay $1.2 million for improvements to the Premises, defined as "Tenant's Work" in the Lease, which expressly included "fixtures," but did not include any reference to "trade fixtures."  Landlord asserts that it intended that the Disputed FF&E – consisting of remote refrigeration systems/walk-in refrigerators/freezers, associated copper piping, motors, compressors, condenser, refrigeration display cases, sinks, deli cases, and the baler – once affixed to the Premises, would be permanent fixtures to remain with the Premises, so that the Premises could be used as a grocery store for the Debtor as well as any future tenants.

14

This purported ambiguity, Landlord asserts, should have led the Bankruptcy Court to consider extrinsic evidence of the parties' intent. Landlord adds that it "presented the only evidence on the intent of the parties" – that the Disputed FF&E were intended to be permanent fixtures – but the Bankruptcy Court improperly ignored this evidence. (D.I. 14 at 23)

The Bankruptcy Court determined that the Lease, read as a whole, is not ambiguous with respect to the property that would remain property of the Debtors upon termination. On this point, instead, the Lease is reasonably susceptible to only one interpretation. *See Lucky's Market*, 2021 WL 1100066, at *10 (determining that Lease contained "no provisions . . . that a reasonable person would find to be subject to different or inconsistent interpretation"). Landlord argues on appeal that the Bankruptcy Court erred in its determination that the Lease is unambiguous (*see* D.I. 14 at 21-22), but Landlord's proposed interpretation of the terms "fixtures" and "trade fixtures" is inconsistent with the language of the Lease and Kentucky law.

### a.   Section 2(c) – Tenant's Work Provision

Landlord's argument relies on section 2(c) of the Lease ("Tenant's Work Provision"), which defines Tenant's Work as follows:

> "Tenant's Work" means all leasehold improvements, ***fixtures, equipment and merchandise required for Tenant to open the Premises for business*** to the public that is not included in the Landlord's Work. Tenant agrees that (i) all plans, specifications and drawings for the Tenant's Work will be subject to Landlord's prior written approval (which approval will not be unreasonably withheld) and (ii) Tenant will be responsible for obtaining all applicable governmental approvals and permits necessary for the completion of Tenant's Work (which permits will be diligently pursued by Tenant) and Tenant's occupancy of the Premises, including, without limitation, a building permit and a certificate of occupancy. Tenant shall diligently pursue Tenant's Work to completion. Landlord shall allow Tenant access to the premises to begin the Tenant's work upon execution of this Agreement ("Landlord's Delivery Date"). Tenant agrees not to interfere with Landlord's work.

(Lease § 2(c) (emphasis added))  According to Tenant, because Tenant's Work does not include

the term "trade fixtures," this provision was intended to make any work performed by Debtors

permanent fixtures that were to remain in the Store after termination of the Lease.  (Larmore

Decl. ¶¶ 19-20)  The Bankruptcy Court disagreed with this interpretation, and so does this Court.

The language in the Lease is consistent with controlling law on what constitutes a trade fixture,

i.e., property annexed to real estate to aid the tenant in carrying out its business.

      Landlord continues to argue on appeal that this provision supports its claim to title to the

Disputed FF&E.  (*See* D.I. 14 at 22-24)  Landlord cites the Larmore Declaration, which states

that Mr. Larmore did not believe any of Tenant's Work included "trade fixtures" and that all

"fixtures" installed at the Store would be permanent fixtures.  (Larmore Decl. ¶¶ 12, 19-20)  But

this interpretation of the Tenant's Work Provision is not supported by the plain language of the

Lease.  Instead, as the Bankruptcy Court noted, accepting Landlord's interpretation of the Lease

would lead to inconsistent and absurd results.  For example, the first sentence of the Tenant's

Work Provision also includes "equipment."  Under Landlord's interpretation, Debtors'

equipment would not be classified as a "trade fixture" and would become permanent fixtures.

Read in the context of the rest of the Lease, the plain language of the Tenant's Work Provision

does not reflect an intention that any of Debtors' property – including Debtors' fixtures, trade

fixtures, equipment, merchandise or any other personal property – would become permanent

fixtures belonging to Landlord after installation.

### b.  Section 2(d) – Tenant Improvement Allowance Provision

      Landlord further relied upon section 2(d) of the Lease ("Tenant Improvement Allowance

Provision"), arguing that this provision shows the parties' intent that anything provided by

Debtors under Tenant's Work would become property of Landlord and remain on site following

Lease termination:

> Tenant Improvement Allowance.  Landlord will reimburse Tenant
> for the costs of designing, permitting and performing Tenant's
> Work *in the amount of the Tenant Improvement Allowance*
> defined below.  Landlord will pay the amount of the Tenant
> Improvement Allowance to Tenant in 2 payments within 30 days
> after receipt by Landlord of Tenant's written request therefore,
> together with all the required documentation under this Section as
> follows: (i) $20.00 per square foot of the Tenant Improvement
> Allowance within 30 days after Tenant's fifty (50%) percent
> completion of the Tenant's Work and delivery to Landlord of
> reasonable evidence of the same (including paid invoices and any
> applicable lien waivers of subcontract work over Twenty-Five
> Thousand ($25,000.00) Dollars); and (ii) the remaining $20.00 per
> square foot of the Tenant Improvement Allowance within 30 days
> of Tenant's: (A) completion of the Tenant's Work as evidenced by
> a certificate issued by Tenant's architect or general contractor; (B)
> the issuance of a certificate of occupancy (or its local equivalent)
> by the applicable governmental authority having jurisdiction over
> the Premises; (C) submission to Landlord of copies of final
> unconditional lien waivers from Tenant's general contractor and all
> third party subcontractors and suppliers providing more than
> Twenty-Five Thousand ($25,000.00) of services or materials with
> respect to Tenant's Work; and (D) Tenant being open for business
> in the Premises.  The total of the payments to be paid by Landlord
> with respect to the Tenant's Work will in no event exceed the
> amount of the Tenant Improvement Allowance.  "Tenant
> Improvement Allowance" means the sum of $40.00 per square foot
> of the Premises.  In addition to other remedies set forth in this
> Lease, if Landlord fails to pay Tenant the Tenant Improvement
> Allowance within 10 days after a written request from Tenant that
> follows the initial 30-day request, Tenant may offset the unpaid
> Tenant Improvement Allowance owed by Landlord hereunder, plus
> interest at the Interest Rate set forth in Section 4(e) from the date
> due until the date so offset, against Base Rent, CAM Charges and
> other payments due to Landlord under this Lease.  In performing
> the Tenant's Work, Tenant shall keep the Premises and Shopping
> Center free from liens and other encumbrances arising in
> connection with the Tenant's Work.  Without limiting the
> provisions of Section 13(c)(i) and subject to Landlord's payment
> of the Tenant Improvement Allowance as and when required,
> Tenant shall indemnify, defend and hold Landlord harmless from
> and against any loss, cost, claim, expense or demand arising in

connection with the Tenant's Work, including, without limitations, claims and demands of contractors, subcontractors, suppliers and other parties providing materials and services in connection with the performance of the Tenant's Work ("Tenant's Work Claims").

(Lease § 2(d))

The plain language of the Tenant Improvement Allowance Provision reflects the Parties' intent to set forth the terms for Landlord to reimburse Debtors for a portion of Debtors' buildout and construction costs for the Store. As set forth in the Tenant Improvement Allowance Provision, the Tenant Improvement Allowance ("TIA") was intended to reimburse Debtors for "designing, permitting and performing Tenant's Work *in the amount of the Tenant Improvement Allowance* . . . ." (*Id.*) (emphasis added). As recognized by the Bankruptcy Court, the plain language of the Tenant Improvement Allowance Provision does not require Debtors to apply the TIA to specific leasehold improvements, fixtures, trade fixtures, equipment, merchandise, or any other personal property purchased by Debtors. It does not reflect that the parties' intent was for the TIA to be in exchange for leaving all (or any) of Debtors' property at the Store as permanent fixtures when Debtors vacated or terminated the Lease; nor does it reflect that the parties' intent was for the TIA to be an indirect payment of or for specific items of FF&E.[4]

_____

[4] These findings are supported by the record. Landlord admits that the Tenant Improvement Allowance Provision was a material term for Debtors to agree to enter into the Lease. (11/3/20 Tr. at 247:2-14; Larmore Decl. ¶ 15 ("Lucky's would not enter into the Lease unless Landlord paid significant amounts for the build-out for use as a grocery store.")) Mr. Larmore further stated, "I don't typically offer up a bunch of money to tenants." (11/3/20 Tr. at 247:13-14) Despite these facts, Mr. Larmore testified that it was always his (and Landlord's) intention that in exchange for Landlord's payment of the TIA, Debtors' property, specifically the Disputed FF&E, was to become permanent fixtures when Debtors vacated or terminated the Lease. (*Id.* at 247:15-17; 1/8/21 Tr. at 19:8-13;40:25-41:4) The Bankruptcy Court found no evidence in the record that the Landlord communicated this purported intent to Debtors.

In accordance with the Tenant Improvement Allowance Provision, when Debtors had completed 50% of the Tenant's Work, they invoiced the first TIA payment in the amount of $601,900 as a lump sum amount, which was paid on March 28, 2014.  (Debtors' Ex. L, M)  After Debtors opened the Store, Debtors invoiced the second TIA payment in the amount of $601,900 on May 20, 2014, which was paid on June 18, 2014.  (APP2857-2881)  Landlord admits that the Debtors paid approximately $3.2 million for the total buildout of the Store.  (11/3/20 Tr. at 255:9-22; APP1709-1717)  Landlord admits that the total TIA paid by the Landlord to the Debtors was $1,203,800.  (11/3/20 Tr. at 262:21-263:9)  Landlord admits that the TIA was not specifically allocated to any of the specific FF&E to which Landlord claims title.  (*Id*. at 161:18-22; 248:11-14)  The TIA reimbursed Debtors for only a portion ($1,203,800 of $3,200,000) of Debtors' construction and buildout costs.  The Lease demonstrates no intent to treat the TIA as a dollar-for-dollar "indirect payment" of any of Debtors' property.  (*Id.* at 248:16-249:5)

Based on the plain language of the Lease, the Bankruptcy Court properly found that the TIA provided for payment of a predetermined amount to be used by Debtors in the buildout of the Store as an incentive to enter into the Lease and not as a mechanism for the transfer of title to Landlord.  The Tenant Improvement Allowance Provision is not reasonably susceptible to a different interpretation.

### c.  Sections 22 and 23 – Tenant's Property Provision and Definition of Personalty

Section 23 ("Tenant's Property Provision") provides, in relevant part, "All of the Personalty will be and remain the personal property of Tenant."  (*Id.*)  Section 22 defines Personalty as "***Tenant's fixtures, trade fixtures***, furnishings, inventory and equipment."  (*Id.* at ¶ 22) (emphasis added)  The plain language of this provision reflects the parties' intent to set forth the scope of Debtors' personal property to ensure such property remained Debtors'

property upon termination of the Lease. (*Id.* at ¶¶ 22-23)  Although the terms "Tenant's fixtures" and "trade fixtures" are not defined in the Lease, inclusion of both terms in the definition of Personalty reflects the parties' intent for Personalty to be interpreted broadly.

### d.  Section 11 – Alterations and Additions Provision

Landlord cites section 11 of the Lease ("Alterations and Additions Provision") in support of the argument that terms used in the Lease are inconsistent and ambiguous:

> <u>Alterations</u>.  After completion of Tenant's initial leasehold improvements, Tenant will not make any exterior or structural alterations or additions to the Premises without the prior written consent of Landlord, which consent will not be unreasonably withheld.  Tenant, at Tenant's sole cost and expense, will have the right in its sole discretion to make any interior, nonstructural alterations or additions or perform any interior remodeling of a nonstructural nature.  All alterations and additions to the Premises by Tenant must be made in accordance with all applicable laws and, ***except for trade fixtures, machinery, equipment, shelving, trash compactors, cash registers, signs and other personal property of Tenant***, will remain at the end of the Term for the benefit of Landlord.

(Lease ¶ 11) (emphasis added)  The plain language of this provision reflects the parties' intent to set forth certain property ("trade fixtures, machinery, equipment . . . and other personal property of the Tenant") that would remain property of Debtors upon termination of the Lease. (*Id.*)  As the Bankruptcy Court recognized, and this Court agrees, inclusion of the catchall phrase "and other personal property of the Tenant" reflects the parties' intent that the property that would remain property of Debtors would not be limited to the specific property expressly listed.

Landlord appears to argue that this provision does not reference "Personalty," "fixtures," or "Tenant fixtures."  The absence of those terms in this one provision, is not, however, dispositive. *See Lucky's Market*, 2021 WL 1100066, at * 9.  Read together, the Tenant's Property Provision, the Alterations and Additions Provisions, and the definition of Personalty

"indicate that Debtors' personal property was intended to be a broad category that would include tenant's fixtures, trade fixtures, furnishings, equipment and inventory." *Id.*

The Court agrees. The inclusion of the term "other personal property of Tenant" indicates that this is a broad provision meant to capture a relatively wide range of property. Landlord offers no other reasonable interpretation.

### 2. The Bankruptcy Court Correctly Determined the Intent of the Parties from the Four Corners of the Lease

Landlord incorrectly asserts that the Bankruptcy Court failed to consider the parties' intent, including the evidence Landlord presented. (D.I. 14 at 25, 28) As Debtors correctly point out, the only evidence of intent the Bankruptcy Court could consider, and did consider, was the plain language of the Lease. Having determined that the Lease is unambiguous, the Bankruptcy Court was required to determine the parties' intent with respect to the terms of the Lease from the four corners of the document. Consistent with Kentucky law, no extrinsic evidence of intent is to be considered.

Moreover, as the Bankruptcy Court found, there is no evidence that Mr. Larmore or anyone else on behalf of Landlord communicated Landlord's intent to Debtors or Debtors' broker while negotiating the Lease. (1/8/21 Tr. at 8-21) In fact, Mr. Larmore testified that he never communicated directly with anyone at Debtors. (11/3/20 Tr. at 246:7-10) Mr. Larmore further stated that he "intended to be bound by the language of the lease," clearly indicating that it was Landlord's intent for the plain language of the Lease to speak for itself. (1/8/21 Tr. at 21:10-13)

### 3. Consistent with Kentucky Law, the Disputed FF&E Are Trade Fixtures Under the Lease

Landlord admits that the Lease is unambiguous that "trade fixtures" remain property of Debtors at the end of the Lease term.  (D.I. 14 at 24)  The terms "fixtures" and "trade fixtures" are legal terms of art, and nothing in the Lease evidences the parties' intent to deviate from Kentucky law with respect to their definition.  Under Kentucky law, the common law analysis of whether property is a trade fixture (personal property) or a fixture (realty) is subject to a presumption "that a tenant or lessee brings property onto a landlord's or lessor's land for his own enjoyment, temporarily, and not for the benefit of the landowner." *S. Indus., LLC v. Maxine, LLC*, 2009 WL 4060698, at *6 (Ky. Ct. App. Nov. 25, 2009).  As a consequence, "[a]s between landlord and tenant[,] the greatest latitude and indulgence is given to the claim that fixtures attached to the realty by the tenant remain [the tenant's] personal property." *Warren Post No. 23, Am. Legion v. Jones*, 196 S.W. 2d 726, 729 (Ky. 1946).  "[A]n item of property that a lessee annexes to realty, belonging to a lessee, and used by the lessee for purposes of trade is generally regarded as remaining personal property, rather than becoming real property, based on principles of public policy and a desire to encourage trade and manufacturing." *S. Indus.*, 2009 WL 4060698, at *4 (citing *Van Ness v. Pacard*, 27 U.S. 137 (1829)).

As Debtors correctly argue, Kentucky courts have consistently classified trade fixtures as "personal property" and recognized the right of the tenant to remove such fixtures.  A trade fixture is "property which a tenant has placed on rented real estate to advance the business for which it is leased and which may, as against the lessor, be removed at the end of the tenant's term." *Bank of Shelbyville v. Hartford*, 104 S.W.2d 217, 218-19 (1937) (bowling alleys, alleyways, racks and seats and other equipment were trade fixtures).  The size of the equipment or machinery does not determine the status as a fixture or trade fixture. *See e.g., In re Louisville*

*Daily News v. Enquirer*, 20 F. Supp. 465 (W.D. Ky. 1937) (printing company's heavy printing press that required reconstruction of landlord's building, concrete foundation for support, light and power connections, was trade fixture removable by tenant); *In re Heat 'N' Eat Brands, Inc.*, 174 F. Supp. 598, 599 (W.D. Ky. 1959) (automatic filing and conveying machine used for tenant's business bolted to building's floor and having power and water connections was trade fixture removable by tenant).

Under the modern doctrine of fixtures, "the idea that physical attachment is controlling is exploded; the status is determined by the character of the act by which the structure is put in place, the policy of the law connected with its use and purpose, and the intention of the parties." *Finley v. Ford*, 200 S.W.2d 138, 140 (1947); *see also Holt v. Henley*, 232 U.S. 637, 641 (1914) ("To hold that the mere fact of annexing the [sprinkler] system to the freehold overrode the agreement that it should remain personalty and still belong to Holt would be to give a mystic importance to attachment by bolts and screws."). "At this time it is a settled rule that an erection made on premises of the owner of real estate for the purposes of trade as well as for some other purposes is removable at the tenant's will at any time before the end of the term." *Bank of Shelbyville*, 104 S.W.2d at 218. The common law test for identifying fixtures considers "[f]irst, annexation to the realty, either actual or constructive; second, adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and third, intention to make the article a permanent accession to the freehold." *Doll v. Guthrie,* 233 Ky. 77, 24 S.W.2d 947, 948 (1929).

"Regarding the first element to the test, an item is annexed to the land if it cannot be removed without serious injury to itself and the land." *S. Indus.*, 2009 WL 4060698, at *2. Kentucky courts give this element little weight. *See id.* at *3. Kentucky courts "[are] against the

common law doctrine that the mode of annexation is the criterion, whether slight and temporary, or immovable and permanent, and in favor of declaring all things to be fixtures which are attached to the realty ***with a view of the purposes for which it is held or employed***." *Doll,* 24 S.W.2d at 948 (emphasis added). Accordingly, annexation is merely a factor to be considered in determining the "controlling" third element: the intention of the owner in the item's use. *See Doll,* 24 S.W.2d at 948 ("[T]he intention of the owner as to its use . . . is of controlling importance in determining the question."); *see also S. Indus.*, 2009 WL 4060698, at *3. "The second element of the test, 'adaptation,' is met when the item in question has been adapted or applied to the use or purpose of that part of the property with which it is connected." *Id*; *see also Doll,* 24 S.W.2d at 948. The third element of the test – the intention of the party making the annexation – is determinative in cases where there is any doubt as to whether an item is, or is not, a fixture. "[T]he intention ***of the party making the annexation***, has been said by some of the authorities to be a controlling consideration, and generally it is held to be the chief test." *Doll,* 24 S.W.2d at 948 (emphasis added). Intention "does not merely imply the secret action of the mind of the owner of the property, nor need it be expressed in words, but ***is to be inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made;*** which, obviously, suggests that the other tests are really part of this comprehensive test of intention, and that they derive their chief value as conspicuous evidence of such intention." *Id.* (emphasis added).

Whether property is a fixture or not also requires analysis of whether it is a "trade fixture" under Kentucky law. *S. Indus.*, 2009 WL 4060698, at *4. Kentucky law defines a "trade fixture" as the personal property of a lessee, specifically "an article annexed by the lessee

to the real estate to aid him in carrying on his trade or business on the premises[,] which may be removed at the end of a tenant's term." *Bank of Shelbyville,* 268 Ky. S.W.2d at 219. "This exception provides that ***an item of property that a lessee annexes to realty, belonging to a lessee, and used by the lessee for purposes of trade is generally regarded as remaining personal property, rather than becoming real property***, based upon principles of public policy and a desire to encourage trade and manufacturing." *S. Indus.,* 2009 WL 4060698, at *4 (citing *Van Ness v. Pacard,* 27 U.S. 137, 143-44 (1829)) (emphasis added). "This is because the intent of annexing a trade fixture to the land is to benefit the business of the party annexing the fixture to the land, not the land itself." *Id.; see also Davis' Adm'r v. Eastham,* 81 Ky. 116, 118 (1883) ("[B]etween landlord and tenant, [the law of fixtures] gives the greatest latitude and indulgence to the claim of articles as personal property; the rule being still broadened with reference to articles used for manufacturing and trade.").

The Bankruptcy Court applied these legal standards and found that all of the Disputed FF&E are trade fixtures and remain property of Debtors at the end of the Lease term. The Bankruptcy Court correctly found that all of the Disputed FF&E were purchased and installed by Debtors to aid Debtors in operating their trade as a grocery store. This finding is supported by the record, as Landlord's own witness, Jeremy Hamilton, admitted that all of the items Landlord claims as fixtures were sourced, purchased, and installed by Debtors for the purpose of operating their trade as a grocery store. (11/3/20 Tr. at 161:10-22) The intent of Debtors is clear in the plain, unambiguous language of the Lease: Debtors would retain all of their property brought onto the Premises, including the Disputed FF&E.

Despite admitting that Kentucky law controls, Landlord cites multiple non-Kentucky cases that are both irrelevant and unpersuasive. (*See* D.I. 14 at 29-34) Based on the Lease and

the record in this case, it is undisputed that all the Disputed FF&E were designed for Debtors'
trade as a grocery store and constitute trade fixtures under Kentucky law.

### 4. Landlord Failed to Provide Credible Evidence of Damages

Landlord asserts that Debtors physically damaged the Premises when they removed the
Disputed FF&E. Landlord seeks damages "to put the space back to original condition when
Lucky's Market was in existence as per land lord drawings at move in date" and contends it is
entitled to administrative expense priority in the amount of these damages. (AP1546-1549) In
support, Landlord relied on the IRCC's $386,695.00 bid to complete repairs to the Premises and
the testimony of IRCC's representative Elmer Howard. Mr. Howard testified that Landlord's
agent, Jeremy Hamilton, expressly requested that IRCC provide a bid to put the Premises in a
"move-in ready" state for a new grocery store tenant. (11/3/20 Tr. at 211:14-212:4) Debtors
were not required, however, to return the Premises to a move-in ready state for a new grocery
store tenant under the Lease. Accordingly, the Court finds no error in the Bankruptcy Court's
determination that IRCC's bid is not a reliable estimation of damages.

Moreover, the Bankruptcy Court determined that Mr. Howard's testimony lacked
credibility. Mr. Howard admitted on cross-examination that IRCC only does work for Landlord
and Landlord's affiliates. (11/3/20 Tr. at 203:2-10) Mr. Howard further testified that IRCC's
primary business is maintenance work, and that the average project price of IRCC's jobs is
$2,500 – not anything like the type of work involved in a $386,695.00 estimate. (*Id.* at 204:6-9,
15-19) Finally, Mr. Howard stated on cross-examination that, notwithstanding the
representations made in his declaration, he is not a general contractor. (*Id.* at 205:14-19) The
record supports the Bankruptcy Court's credibility findings, which are entitled to significant
deference on appeal.

Landlord argues on appeal that the Bankruptcy Court should have considered the Bosse Construction bid. (D.I. 14 at 41)  However, no witnesses testified in support of that bid, and the Bankruptcy Court had no way to determine its accuracy or what was considered in preparing the bid. The Bankruptcy Court did not err in refusing to give significant weight to the Bosse bid.

### 5.    The Bankruptcy Court Properly Determined that Landlord Did Not Meet its Burden of Proving Tort Causes of Action

Some courts have recognized a narrow exception to the plain language of § 503(b), whereby "fairness may call for the allowance of post-petition tort claims as administrative expenses if those claims arise from actions related to the preservation of a debtor's estate despite having no discernable benefit to the estate." *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 173 (3d Cir. 2012), *as corrected* (Oct. 25, 2012) (citing *Reading Co. v. Brown*, 391 U.S. 471, 477 (1968)). Landlord's Application further asserted entitlement to an administrative expense claim under this exception, often referred to as the "Reading Doctrine."

For a claimant to be entitled to administrative expense claim under the Reading Doctrine, it must demonstrate that its allegations support a tort cause of action. *See generally Philadelphia Newspapers*, 690 F.3d at 173 (affirming district court's order sustaining debtors' objection to administrative expense requests on basis that claimant could not advance sustainable cause of action to support requests under section 503(b) or Reading Doctrine). Landlord advanced two tort claims to support its administrative priority claim: (1) conversion and (2) negligence and negligent supervision. The Bankruptcy Court determined that Landlord failed to prove the existence of any tort that would give rise to an administrative expense claim under the Reading Doctrine. *See Lucky's Market*, 2021 WL 1100066 at *12. The Court reviews these issues below.

### a. Conversion

As the Bankruptcy Court correctly noted, under Kentucky law, a party commits the tort of conversion when "(1) the plaintiff had legal title to the converted property; (2) the plaintiff had the right to possess the property at the time of the conversion; (3) the defendant exercised dominion over the plaintiff's property in a way that deprived the plaintiff of its use and enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff demanded return of the property and the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damages from the loss of the property." *Ford v. Baerg*, 532 S.W.3d 638, 641 n.2 (Ky. 2017).

The Court agrees that Landlord did not meet these elements.  Debtor purchased, and at all times retained, title to the Disputed FF&E, which are trade fixtures under Kentucky law, and nothing in the Lease or the actions of the parties transferred title to Landlord.  Thus, Debtors were entitled to sell and remove the Disputed FF&E.  The Bankruptcy Court correctly held that removal of the Disputed FF&E cannot support a claim for conversion.

### b. Negligence and Negligent Supervision

Under Kentucky law, to prove negligence "a plaintiff must prove the existence of a duty, breach of that duty, causation between the breach of duty and the plaintiff's injury and damages." *Hayes v. D.C.I. Properties-D KY, LLC*, 563 S.W.3d 619, 622 (Ky. 2018).  There must, therefore, be an agency relationship, to demonstrate that Debtors had a duty to supervise the Buyer.  Landlord contends that Debtors, through the Liquidation Consultant and its agents, had a duty to supervise the removal of the Disputed FF&E, to ensure that removal (1) was performed in compliance with the Store Closing Procedures Order, and (2) none of Landlord's property was removed or damaged.

28

The Bankruptcy Court determined that Landlord failed to demonstrate that Debtors breached a duty.  The Court agrees.

The items removed from the Premises were property of Debtors and cannot support a breach of duty.  That damage occurred is supported by photos showing that the Store was left with more than small holes caused by nails fasteners and the like.  However, Landlord failed to present credible evidence of damages, failing to meet another of the requirements for proving this tort.  Landlord, therefore, failed to meet its burden of proving negligence.

### B.      The Bankruptcy Court Properly Denied the Application Pursuant to § 365(d)(3) of the Bankruptcy Code

Pursuant to Bankruptcy Code section 365(d)(3), "The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title."  11 U.S.C. § 365(d)(3).  Landlord alleged that, because Debtors breached the Lease, they are entitled to an administrative claim for their damages under § 365(d)(3).  The Bankruptcy Court rejected this argument.  *See Lucky's Market*, 2021 WL 1100066 at *13.  This Court does as well.

As Debtors correctly point out, "Courts have found that damages triggered by the 'termination' of leases do not arise pre-rejection, and, thus, are not obligations under section 365(d)(3), but arise upon rejection, and are general unsecured claims under section 365(g)(1)."  *In re BH S & B Holdings LLC*, 426 B.R. 478, 484 (Bankr. S.D.N.Y. 2010).  "[A]ffording rejection claims administrative priority would effectively eliminate the purpose behind providing a debtor with the power to reject a contract."  *In re Old Carco LLC*, 424 B.R. 633, 640 (Bankr. S.D.N.Y. 2010).  "[T]here is no need for a 'special rejection power' if a debtor is forced, nevertheless, to bear administrative liability when it breaches an agreement post-petition."  *Id.*

Landlord argues on appeal that the removal of the Disputed FF&E – and the damage to the Premises caused by the removal – occurred post-petition, prior to rejection of the Lease, and, thus, the Bankruptcy Court erred by denying the Application. (*See* D.I. 14 at 42)  Indeed, the record demonstrates that all removal of the FF&E occurred from February 5 through 18, 2020, prior to the rejection of the Lease. (Mclean Deposition Tr. at 25:21-26:13, 79:22-80:4; Renier Decl. ¶¶ 27-31, 60-61)  However, "sections 365(g) and 502(g) provide, unambiguously, that rejection claims are pre-petition claims." *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 60 (Bankr. S.D.N.Y. 2004).  Courts routinely hold that clean-up costs like those asserted here are pre-petition obligations.  For example, in the *Ames Dep't Stores* case, the bankruptcy court for the Southern District of New York found that holding that cleanup costs are post-petition obligations "would be inconsistent with the doctrinal underpinnings under which motions to reject burdensome obligations are made, and would eviscerate the provisions of the Code that enable estates to relieve themselves of post-petition obligations under burdensome executory contracts." *Id.* at 60.  That court found the claims in question were contractual claims for the damages that landlords suffered after (and upon) the debtor's rejection and removal from the premises, and that such claims were rejection claims. *See id.*  The *Ames* Court reasoned that "[t]he point is not that the Landlords had no legally cognizable injury when the Debtors failed to remove their shelving and racks – for plainly the Landlords did – but rather that Congress has made a legislative determination that rejection claims are pre-petition claims, with no priority over the claims of other unsecured creditors, who also suffered legally cognizable injury." *Id*.  This analysis applies here and fully supports the Bankruptcy Court's conclusion.

Additionally, Landlord failed to prove that Debtors breached the Lease and failed to provide credible estimations of damages for the costs the alleged damages.  Thus, again, the

Bankruptcy Court correctly determined Landlord is not entitled to an administrative expense claim under § 365(d)(3).

###    C.    Landlord Is Not Entitled to an Award
              Pursuant to § 105(a) of the Bankruptcy Code

Landlord contends that Debtors breached the Store Closing Procedures Order when they removed the Disputed FF&E, and, therefore, Landlord should be entitled to an administrative priority claim under § 105 of the Bankruptcy Code.  In accordance with 11 U.S.C. § 105(a), "a bankruptcy court may issue any order, process or judgment that is necessary or appropriate to carry out" the provisions of the Bankruptcy Code.  11 U.S.C. § 105(a); *see also In re W.R. Grace & Co.*, 412 B.R. 657, 667 (D. Del. 2009).  Landlord contends that, in violation of the Store Closing Procedures Order, Debtors (i) sold Landlord's property, and (ii) sold property that was not "moveable."  (D.I. 14 at 44)

As already explained, however, Debtors did not breach the Store Closing Procedures Order when they sold the Disputed FF&E.  As the Disputed FF&E was not property of the Landlord, Buyer was entitled to remove and sell it; Buyer submitted evidence that it did so in line with industry standard.  Moreover, the Bankruptcy Court correctly found that the Disputed FF&E were all moveable FF&E, as that term is used in the Store Closing Procedures Order.

Kentucky law contemplates and allows movable trade fixtures to include property that is large, heavy, and cumbersome.  *See S. Industrial*, 2009 WL 406098, at *5 (forty-foot tall, several ton silos described as moveable trade fixtures).  Mr. Wyke testified that movable FF&E in a grocery store is a broad category that can include deli cases, walk-in coolers, walk-in refrigeration units, compressors, evaporators, condensers, non-bathroom sinks, and kitchen implements.  (1/8/21 Tr. at 123:21-124:6; 184:10-16)  No testimony was offered to contradict this assertion.  The Court finds no error in the Bankruptcy Court's conclusion that all of the

Disputed FF&E was moveable and its sale did not violate the Store Closing Procedure Order. *See Lucky's Market*, 2021 WL 1100066 at *13-14.

### D.     No Spoliation of Evidence Has Been Shown

Landlord argues on appeal that Debtors' spoliation of evidence required an adverse inference that should have shifted the burden of proof to Debtors as to when damage to the Premises occurred, and as to the cost of repairs and replacement of the Disputed FF&E. Landlord did not raise spoliation in its Application, during the evidentiary hearing, or at any time prior to Landlord's submission of its Proposed Findings of Fact and Conclusions of Law. The Bankruptcy Court denied Landlord's requested relief on its merits. *See Lucky's Market*, 2021 WL 1100066 at *14.

Under Third Circuit law, "[s]poliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.,* 665 F.3d 68, 73 (3d Cir. 2012). If spoliation has occurred, the Court must then consider three factors in determining the appropriate sanction: (i) the degree of fault of the party who altered or destroyed the evidence; (ii) the degree of prejudice suffered by the opposing party; and (iii) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. *See Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir. 1994).

Nothing in the record supports a finding that Debtors caused spoliation of any evidence. The mere fact that the Disputed FF&E was packaged and partially removed before Landlord arrived at the Premises does not equate "actual suppression or withholding of evidence." Even if

32

the Bankruptcy Court determined that spoliation had occurred, there would be no prejudice to the opposing party, as the Disputed FF&E were trade fixtures and thus property of the Debtors. Accordingly, the Bankruptcy Court's finding of no spoliation is affirmed.

## V.     CONCLUSION

The Bankruptcy Court properly exercised its discretion in denying the Application. Landlord failed to demonstrate how the Bankruptcy Court deviated from applicable legal authority or relied on clearly erroneous factual findings. Accordingly, the Order will be affirmed. An appropriate Order follows.

March 22, 2022
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES CIRCUIT JUDGE